# EXHIBIT J

{00179898.1}

# In The Matter Of:

*Krause & Martin v.*
*Manalapan Township*

---

*Kenneth R. Wallentine*
*November 29, 2010*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

COPY



Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEW JERSEY
            CIVIL NO. 09-2871 (JAP) (TJB)
 3
    ---------------------------
 4   FRANK KRAUSE and
     WILLIAM MARTIN,          :
 5                            :    DEPOSITION UPON
          Plaintiffs,         :    ORAL EXAMINATION
 6                            :         OF
             v.               :    KENNETH R.
 7                            :    WALLENTINE
     MANALAPAN TOWNSHIP,      :
 8                            :
          Defendant.          :
 9   ---------------------------
10
11
12            T R A N S C R I P T  of the stenographic
13   notes of HOWARD A. RAPPAPORT, a Certified Shorthand
14   Reporter of the State of New Jersey, Certificate No.
15   XI00416, taken at the offices of Newark Airport
16   Marriott Hotel, Newark, New Jersey, on Monday,
17   November 29, 2010, commencing at 9:15 a.m.
18
19
20
21
22
23
24
25
```

Page 2

```
 1   A P P E A R A N C E S :
 2
     POST, POLAK, GOODSELL MAC NEILL & STRAUCHLER
 3   425 Eagle Rock Avenue
     Roseland, New Jersey 07068
 4   BY:  FREDERICK B. POLAK, ESQ.,
     For the Plaintiffs
 5
     MC LAUGHLIN, GELSON, D'APOLITO & STAUFFER, LLP
 6   1305 Campus Parkway
     Wall Township, New Jersey 07753
 7   BY:  JOHN F. GELSON, ESQ.,
     For the Defendant
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Wallentine - direct                                          Page 3

```
 1        (Exhibit marked for identification W-1,
 2   Report and curriculum vitae.)
 3   K E N N E T H  R.  W A L L E N T I N E, having been
 4   first duly sworn, testifies as
 5   follows:
 6     DIRECT EXAMINATION BY MR. POLAK:
 7   Q  Mr. Wallentine, my name is Fred Polak
 8   and I'm representing two either current or former
 9   police officers in the Manalapan Township Police
10   Department in the United States District Court,
11   District of New Jersey.
12        You are here pursuant to a subpoena.  I
13   understand that you are an expert that has been
14   retained by the Township, is that correct?
15   A  Yes, sir.
16   Q  I take it from your resume that you have
17   had your deposition taken before?
18   A  I have.
19   Q  When was the last time approximately?
20   A  Oh, gosh, it's been within the last
21   three, four months.
22   Q  Okay.
23        Just to be on the safe side, I'm going
24   to go over standard instructions.
25        I'm going to ask you questions and you
```

Wallentine - direct                                          Page 4

```
 1   are required to provide verbal responses to my
 2   questions.
 3        Everything you and I say is being taken
 4   down by the reporter to my left which will be made in
 5   a transcript at a later time.
 6        Although we are not in a courtroom, you
 7   raised your hand to tell the truth and it is a very
 8   solemn act.
 9        Do you understand that?
10   A  Yes.
11   Q  I ask you to provide verbal responses.
12   Don't shake your head --
13   A  I'll do my best to remember, and I will
14   not be offended if he tells me to speak up.
15   Q  I'll tell you from my experience that
16   the reporter is not shy.
17   A  I gathered that.
18   Q  What did you do to prepare for this
19   deposition?
20   A  I took a train ride to lovely Newark,
21   New Jersey.  Wish I had come a day earlier, it's so
22   nice here.
23        I reviewed my report on Monday or
24   Tuesday of this week, glanced over it fairly briefly.
25   Q  Did you speak with any attorneys in the
```

Krause & Martin v.
Manalapan Township

Kenneth R. Wallentine
November 29, 2010

Wallentine - direct                                    Page 77

1  A  Let me answer the easy one first.  It
2  was right after the election of the new sheriff, so
3  it would have been 2006.
4      I don't recall being retained for that
5  specific purpose by other agencies.
6  Q  With respect to that particular
7  retention with the Summit County sheriff's office,
8  did you prepare a report?
9  A  Did not.
10 Q  So whatever advice you gave was verbal?
11 A  No.
12 Q  Did you give any advice?
13 A  I did.
14 Q  Was it electronic?
15 A  I know the rules say I'm not supposed to
16 help you, but the new sheriff -- there was a new
17 sheriff in town, quite literally, and a major
18 transition in the sheriff's office.
19     As part of advising the sheriff on
20 making certain transitions that became apparent that
21 the sheriff's office had been laboring without
22 adequate law enforcement policies, I was retained by
23 the county's risk manager to evaluate the sheriff's
24 policy manual.
25     After I did that I gave oral advice to

Wallentine - direct                                    Page 78

1  the effect that it was a piece of garbage.
2      Then, surprisingly, the county's risk
3  manager retained me to write an entire new policy
4  manual that included a K9 policy.
5      I don't know how much of that policy was
6  adopted.  I don't know how much of it was still in
7  force, but I provided a written product in the form
8  of a policy manual.
9  Q  Did the written product you provided
10 include any language pertaining to the compensation
11 of the K9 officers for their care of K9s while off
12 duty?
13 A  I know we discussed it, but I don't know
14 whether it's in writing or not.
15 Q  Do you have a copy of what you prepared?
16 A  I believe that I do.  I'm not certain.
17 Q  If you do, would you provide it to
18 Mr. Gelson?
19     In general, in your experience, do times
20 vary for the amount of time dog handlers spend with
21 their dogs?
22 A  Yes.
23 Q  What are the reasons for the variations?
24 A  Earlier you referred to the relationship
25 between a K9 handler and her or his police service

Wallentine - direct                                    Page 79

1  dog.  The qualities and natures of relationships may
2  vary.  That depends on the individuals.  It depends
3  on dog personalities.  It depends on, among other
4  factors, the profile to which the dog is assigned,
5  and it depends on the perception of a need for the
6  dog and a number of human factors.
7      It may also depend on whether the dogs
8  are home kenneled or centrally kenneled, whether
9  there are other caretakers available for the dogs in
10 an off duty environment.
11     It may depend on other time demands
12 placed on the handler.  It may depend on the seasonal
13 issues.
14     Those are some of the things that most
15 quickly come to mind in response to your question.
16 Q  In your contact with law enforcement
17 officers who are K9 handlers, do some perform solely
18 as K9 handlers?
19 A  Yes.
20 Q  Are there other K9 handlers who perform
21 functions other than with their K9s?
22 A  Yes.
23 Q  Are there some who go on general patrol
24 with their K9s, but have the same responsibilities as
25 those officers who are on patrol that don't have K9s?

Wallentine - direct                                    Page 80

1  A  Generally speaking, yes.
2  Q  Would it be fair to say the care of K9
3  dogs at home during off duty time is different from
4  the care of a family pet?
5  A  Yes.
6  Q  Turn to page four of your report.
7      You write on page four, "With respect to
8  the plaintiffs' expert's chart listing various police
9  service dogs and their tasks," you say, "The time
10 that plaintiffs believe to have spent on each task,"
11 and then you go on.
12     Why do you use the word "believe"?
13 A  I asked, prior to preparing my report,
14 whether there were any kind of daily activity reports
15 or time records or any form of records that could be
16 provided to me to tie to this chart that plaintiffs'
17 expert had prepared.
18     I was told that there were no such
19 records.
20 Q  Did you ask whether the Manalapan Police
21 Department required that its K9 officers keep time
22 records of daily activities?
23 A  Generally speaking.
24 Q  When you asked whether there were time
25 records kept, did you also ask whether the police

Krause & Martin v.
Manalapan Township

Kenneth R. Wallentine
November 29, 2010

| Wallentine - direct | Page 81 |
| --- | --- |

1  department required that there be daily activity
2  reports or time records?
3  A  Some of the documents provided to me
4  showed that there were in fact time activity reports
5  kept.
6  Q  Did you ask whether the Manalapan Police
7  Department required that its K9 officers keep time
8  records of off duty care or home care of their K9?
9  A  I did not.
10 Q  Do you know whether there was any such
11 requirement of the Manalapan Police Department?
12 A  I do not.
13 Q  Would it be fair to say that there are
14 some police departments that require that officers,
15 K9 officers, keep such records, and there are other
16 departments which have no such requirement?
17 A  That's fair.
18 Q  Looking at page five of your report, do
19 you understand this to be the chart that was offered
20 by plaintiffs' expert in his report?
21 A  I had this retyped so that it would
22 reproduce and fit, but this data, or the data
23 contained here was taken from Mr. McSweeney's report.
24 Q  The first column is "Task," is that
25 correct?

| Wallentine - direct | Page 82 |
| --- | --- |

1  A  Yes.
2  Q  It lists various tasks required with
3  respect to the care of a K9 by a K9 handler, is that
4  correct?
5  A  It lists tasks identified by
6  Mr. McSweeney with respect to care of a K9, yes.
7  Q  Are there any tasks that you are aware
8  of which were not listed by Mr. McSweeney which you
9  understand a K9 handler should be doing with respect
10 to the care of the K9?
11 A  Yes.
12 Q  What tasks are they?
13 A  One that I noted in particular is that I
14 didn't see any discussion of a frequent task, an
15 important task of taking the dog to the veterinarian
16 for at least an annual checkup.
17     That may vary according to region and
18 according to specific dog handler.
19 Q  Any other tasks that you noticed was
20 missing?
21 A  As I sit here today and look at this, I
22 do not believe so.
23 Q  Do you agree that each of the tasks that
24 were listed by Mr. McSweeney are tasks associated
25 with the care of a K9 by a K9 handler?

| Wallentine - direct | Page 83 |
| --- | --- |

1  A  I agree that these tasks may need to be
2  performed at some juncture.  There are some tasks
3  that I do not believe are necessary, or are not
4  necessary to the degree of frequency and time
5  commitment.
6     Generally speaking, most of these tasks
7  are in fact associated with the service dog handler.
8  Q  When you say most of these tasks, do I
9  understand your testimony to be that each of these
10 tasks is associated with service dog handling, you
11 don't necessarily agree with some of the time
12 allotments?
13 A  No, that's not correct.
14 Q  Which task do you not believe to be
15 associated with service dog handling?
16 A  Home vacuuming and cleaning.  Many
17 police service dogs are never taken into the
18 handler's home.  Home cleaning and parasite
19 prevention, again, many service dogs are not taken
20 into the handler's home, and even though service dogs
21 are taken into the handler's home, prevention of
22 fleas and parasites in the home if the dog is
23 otherwise properly cared for, depending on the
24 region, depending on the location, may not be
25 necessary.

| Wallentine - direct | Page 84 |
| --- | --- |

1     Lawn and yard maintenance, depending on
2  certain circumstances, may not be necessary.
3     Typically vehicle cleaning is performed,
4  but a complete vehicle disinfection would rarely if
5  at all be done.
6     Filling of holes in the yard and the
7  repair typically wouldn't need to be done.
8     The inspection of a fence at certain
9  junctures I think would need to be done.
10    Typically training would not be done off
11 duty.
12    Again, depending on the circumstances,
13 one would not necessarily need to sanitize and
14 disinfect the yard where the dog is kept.
15 Q  What are the circumstances?
16 A  Pardon?
17 Q  What are the circumstances where it
18 would be --
19 A  Where what, a yard would not need to be
20 sanitized?
21 Q  Yes.
22 A  Well, obviously, first off, if the dog
23 is centrally kenneled, not the case in this
24 particular case.
25    Speaking now from personal experience,

Wallentine - direct                                    Page 89

1  one hour?
2  A  I believe so.
3  Q  Do you agree that other than the four
4  hours which would be allotted during the week while
5  on duty in care of the K9s, that the officers would
6  be required to otherwise take care of their K9 during
7  the week?
8  A  I think I understand your question to
9  mean did they have care responsibilities during the
10 three days off?
11 Q  Yes.
12 A  Yes, they would.
13 Q  And would they have care
14 responsibilities during the four days they are on,
15 other than during the one hour that was allotted
16 during a shift?
17 A  Yes.
18 Q  Do you understand that you were retained
19 in this case to opine as to how many additional hours
20 other than the four hours during the shift are
21 required to reasonably take care of K9s by K9
22 handlers?
23 A  I understand that I was retained in this
24 case to examine documents referring to or referencing
25 K9 care and offering an opinion as to the amount of

Wallentine - direct                                    Page 90

1  time that is reasonably necessary to care for a
2  police service dog.
3  Q  Which documents were you just referring
4  to?
5  A  If you will turn to the first page of my
6  report, exhibit W-1, I have listed the documents that
7  were provided to me for review.  The first and second
8  page, actually.
9  Q  And which of those documents provided
10 information to you which allowed you to opine
11 anything about the amount of time reasonably
12 necessary for these officers to care for their police
13 service dogs?
14 A  I don't know that I can identify a
15 specific passage as I sit here, nor do I recall what
16 information was contained particularly in the initial
17 supplemental document disclosure to both parties.
18     I would have relied on those documents,
19 the deposition transcripts, and particularly the
20 plaintiffs and Chief McCormick, and I don't recall
21 how much I relied on the other two depositions as
22 well as information provided from Wall Township and
23 Brick Township.
24     All that information together coupled
25 with my own knowledge and experience.

Wallentine - direct                                    Page 91

1  Q  The information that you received from
2  Brick Township and Wall Township, did you communicate
3  with any police officers or superiors in either of
4  those communities?
5  A  I did not.
6  Q  So the sole information you know about
7  those two communities is based on the documents
8  provided to you by Mr. Gelson's office, is that
9  correct?
10 A  The sole information in the context of
11 what's relevant in this lawsuit, yes.
12     MR. POLAK: I'm going to take a short
13 break myself now.
14     (Recess.)
15 Q  I'm going to show you what has been
16 previously marked as Plaintiff's Exhibit 2, the
17 Manalapan Township police safety through departmental
18 policies and procedures.
19     Is this a document that you reviewed in
20 preparation for your report?
21     (Exhibit handed to the witness.)
22 A  It is.  Well, the first page appears to
23 be, yes.
24 Q  If you go to page 000420, production
25 number page 11.

Wallentine - direct                                    Page 92

1  A  I'm there.
2  Q  In preparation for your report -- in
3  preparing your report, did you review section 9,
4  "General operational orders for K9 personnel"?
5  A  I did.
6  Q  Is there anything that you disagree with
7  in the content there?
8  A  Not significantly.
9  Q  Not significantly suggests that you may
10 have disagreement of a less significant nature.
11 A  It was curious to me that the chief of
12 police had to consent before the dog could be entered
13 into a competitive trial.
14 Q  Anything else?
15 A  No.  And just by way of reference, I
16 assume that you wanted me to continue reading to page
17 17.
18 Q  Yes, right.
19     The second paragraph at page 17 A calls
20 for periodic visits to be made to the home of the
21 handlers by the K9 commanders.
22     Do you know if that ever occurred?
23 A  I do not.
24 Q  Did you ask whether it occurred?
25 A  I did not.

| Wallentine - direct | Page 117 |
| --- | --- |

1 Q  And we have already agreed, have we not,
2 that those tasks in their totality could not be
3 performed solely in the four hours that were provided
4 on duty per shift -- the one hour per shift for four
5 days, correct?
6 A  We have agreed that they can't be
7 performed all in four days.
8 Q  And they can't all be performed during
9 the one hour of those four days, correct?
10 A  By necessity the feeding off duty can't
11 happen on a workday.
12 Q  If that is true, what is the basis for
13 your statement that the four hours paid per week by
14 the police department is adequate for the basic K9
15 care duties required by the department, if we
16 recognize that there are tasks, duties that had to be
17 performed which couldn't be performed during those
18 four hours?
19 MR. GELSON: Object to the form of the
20 question.
21 A  The basis is this.  What I'm -- perhaps
22 you do misunderstand the thrust of what I've
23 attempted to state here.
24 These officers negotiated for and were
25 granted, first by agreement and later by collective

| Wallentine - direct | Page 118 |
| --- | --- |

1 bargaining process and collective bargaining
2 contracts, a procedure, a process by which they were
3 allowed to work anyone hours of a ten-hour workday
4 and be paid for 10 hours, essentially granting them
5 one day during each workday, or a total of four hours
6 a week, that they were paid for not performing patrol
7 functions.
8 That was granted to them in compensation
9 for taking care of the K9s generally.  There wasn't a
10 specificity as to the agreement as to what task would
11 be performed on what days.
12 So what I'm trying to communicate to the
13 reader here is that it's my opinion that the four
14 hours of pay per week for time that they are not
15 expected to perform police patrol duties or K9 patrol
16 duties is adequate to compensate for activities such
17 as feeding the dogs off duty and so forth.
18 Q  So that I'm clear, is it your opinion
19 that four hours a week pay is adequate compensation
20 for all the duties that a K9 officer is required to
21 perform for the care of their K9s through a seven-day
22 week?
23 A  That's correct, assuming that there are
24 a number of activities, and I gave you some examples
25 in my report, that are performed on duty time, such

| Wallentine - direct | Page 119 |
| --- | --- |

1 as things that might consume a great amount of time,
2 taking the dog to a veterinarian, for example,
3 particular training activities that should be
4 conducted only on duty.
5 I don't mean to communicate that it
6 takes only four hours per week total to be a good K9
7 handler and take care of a dog.
8 Q  How many hours a week, in your opinion,
9 is required to perform the functions required to
10 properly take care of a dog?
11 A  Total, without regard to whether it's on
12 duty or off, off duty time?
13 Q  Yes.
14 A  A well-trained dog and a well-organized
15 police service dog handler should be able to
16 accomplish all of the care duties on a routine basis
17 with seven hours per week or one hour per day,
18 recognizing that there will be occasional periods,
19 for example, if the dog gets sick, the dog is
20 injured, needs to be taken to the vet more
21 frequently, or there is some extraordinary
22 circumstance that may impact that average.
23 But as a gross average, I would say an
24 hour per day, even less.
25 Q  You then write in your conclusion, "The

| Wallentine - direct | Page 120 |
| --- | --- |

1 time allotted for K9 care by the Manalapan Police
2 Department and provided in the governing collective
3 bargaining agreement is consistent with many
4 similarly situated law enforcemen6 agencies.
5 Do I understand that it is your opinion
6 that one hour per shift of a 10-hour shift for K9
7 care is consistent with many similar situated law
8 enforcement agencies?
9 A  Yes, one hour per shift per workday is a
10 fairly common arrangement.
11 Q  Are you able to state whether there is a
12 standard and a consistency -- strike that.
13 Are you able to state that there is a
14 standard for the amount of time that K9 officers
15 spend off duty caring for their K9 dog?
16 A  As I understand the word "standard," I
17 have to answer that question no.
18 Q  Based on your opinion, is there a
19 consistent policy in law enforcement agencies
20 throughout the country which provides a specific
21 number of hours that it is believed K9 officers
22 should spend to properly take care of their K9s?
23 A  No.
24 Q  Your last sentence you refer to police
25 service dog industry standards.

1    (Exhibit marked for identification W-3,
2  Article entitled, "Taking a Real Bite Out of Crime.")
3  Q  I'm going to hand you what has been
4  marked as W-3.  It is an article, "Taking a Real Bite
5  Out of Crime."  You are the author of this article,
6  are you not?
7  A  I am.
8  Q  When did you issue this article?
9  A  I don't recall the specific date.  This
10  would have been in the mid '90s.
11  Q  Okay.
12  A  For some reason 1994 pops into my head,
13  but I'm not sure.
14     MR. POLAK: Can I have this marked as
15  the next exhibit.
16     (Exhibit marked for identification W-4,
17  Officers Handbook Series, K9 Officers Legal
18  Handbook.)
19  Q  Showing you what has been marked as W-4,
20  "Officers Handbook Series, K9 Officers Legal
21  Handbook."
22     You are the author of this particular
23  handbook, are you not?
24  A  I am.
25  Q  What is attached is chapter nine.  Is

1  chapter nine the only chapter of that particular
2  handbook that you authored?
3  A  No, I wrote the entire book.
4  Q  When did you write this?
5  A  It was published in 2008, and I would
6  have completed the manuscript in that spring.
7  Q  Who commissioned you, if anyone, to
8  prepare this?
9  A  I was approached by -- I don't remember
10  who, someone from back here in New York that worked
11  for -- I don't remember, but they were associated
12  with one of the companies that Reed/Elsevier.  It may
13  have been someone from LexisNexis that may have
14  approached me.
15  Q  You would agree that the home care
16  responsibilities for K9 handlers who are the
17  plaintiffs in this case was an integral and
18  indispensable part of their job, would you not?
19  A  Although we have identified here today
20  some issues that I have with Mr. McSweeney's
21  characterization of tasks, I agree that home care is
22  an integral, indispensable part of having a police
23  service dog that is not centrally kenneled.
24  Q  You would also agree, would you not,
25  that the number of hours off duty which a K9 officer

1  should devote to the care and responsibility of his
2  or her K9 is dependent, at least in some measure, on
3  variations of dogs, climate control --
4  A  By climate control, did you mean climate
5  generally?
6  Q  Yes.
7  A  Yes.
8  Q  Are any of the opinions -- have you
9  changed any of the opinions that you have offered in
10  W-3, "Taking a Bite Out of Crime"?
11  A  You know, I have not read this for quite
12  some time.
13  Q  Have you changed any of the opinions --
14  would you rewrite anything that you wrote in W-4, K9
15  "Officers Legal Handbook," at least as to chapter
16  nine?
17  A  I would add some material, but I
18  don't -- I have a better recollection of this, it's
19  been a couple of years since I wrote it.  I can't
20  think of anything I would change.
21  Q  Have you ever been retained by a police
22  officer in a case where that officer was a K9 handler
23  and sought compensation pursuant to the Garcia
24  decision or under the FLSA?
25  A  Your question was retained?

1  Q  Yes.
2  A  No.
3  Q  Have you ever been retained by a lawyer
4  for any such police officer as an expert?
5  A  I have assisted a lawyer, but I don't
6  recall, I'm not sure, I don't think I was paid.
7  Q  In that instance did you actually have a
8  retainer agreement that was signed with the lawyer?
9  A  I didn't.
10  Q  Would it be fair to say that in each
11  instance when you have been asked to opine as an
12  expert on K9 officer compensation for off duty work
13  with K9s, it has been on behalf of a police
14  department or law enforcement agency?
15  A  Where I actually have been paid money to
16  do so?
17  Q  Where you have been retained in that
18  case.
19  A  Yes.
20     MR. POLAK: Give me a second.  I'm just
21  about finished.  Let me see if there is anything else
22  I want to follow up on.
23     (Pause.)
24     MR. POLAK: Thank you for your time.
25  Thank you for coming here.

# EXHIBIT K

{00179898.1}

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| FRANK KRAUSE & WILLIAM MARTIN,<br>Plaintiffs, | : | |
| | : | Case No. 3:09-CV-0287 |
| vs. | : | |
| MANALAPAN TOWNSHIP,<br>Defendant. | : | Report of Kenneth R. Wallentine |
| | : | |

The following report of Kenneth R. Wallentine is submitted after review of the following

documents, pleadings, records, and reports:

Plaintiffs' Complaint

Defendant's Answer

Plaintiffs' Initial and Supplemental Document Disclosures

Defendant's Document Disclosures

Plaintiffs' Answers to Interrogatories

Defendant's Answers to Interrogatories

Frank Krause deposition transcript

William Martin deposition transcript

Louis Moreto deposition transcript

John McCormack deposition transcript

Michael Rumola deposition transcript

Stuart Brown deposition transcript

Samuel Britton deposition transcript

Dennis McSweeny Report

Wall Township Police Department General Order 2007-27

Brick Township Clerk letter dated October 14, 2010


Kenneth R. Wallentine states as follows:

1.　　In the instant matter, I have relied upon the documents, diagrams, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein. Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

a.　　Summary of reported facts and conclusions:

　　　　Frank Krause became a police service dog handler for the Manalapan Township Police Department in 2000. Krause was the moving force behind establishing the police department's police service dog unit, having attempted to persuade two police chiefs prior to finally securing approval to begin the unit from Chief McCormack in 2000. Krause kept his police service dog at his home during off-duty time. Krause continued as a police service dog handler until December 2008, when his police service dog, Rocco, died. During the time that Krause served as a police

service dog handler for the Manalapan Township Police Department, Krause also kept another dog at his home, and had two other dogs at his home during most of that time. These dogs were family pets.

William Martin became a police service dog handler for the Manalapan Township Police Department at the same time as Krause. Krause initially arranged for the donation and training of a single police service dog. When the opportunity arose to accept a second donated police service dog, Martin volunteered to train as a police service dog handler. Martin and Krause completed a training course with the Union County Sheriff's Office and were certified as police service dog handlers. Martin remained a police service dog handler until December 2007. Martin also kept his police service dog at his home during off-duty time. Like Krause, he, too, kept one or two other dogs at his home as family pets.

At the formation of the Manalapan Township Police Department canine unit, Krause, Martin and Chief McCormack discussed how the police service dog handlers would be compensated for those canine care activities that were necessarily performed off-duty, such as home care for the dogs on the handlers' days off work. Krause, Martin and McCormack agreed that Krause and Martin would be granted four hours per week for such care. The practical arrangement was to allow Krause and Martin to work only nine hours of a ten hour shift, four days per week, and still be paid for the full ten hours. This agreement was later memorialized in the collective bargaining agreement negotiated between Manalapan Township and the collective bargaining agents for Krause and Martin. The agreement remain in effect as a bargained-for provision in successive collective bargaining agreements.

Plaintiffs' expert provided a chart listing various police service dog care tasks, the time that plaintiffs believed to have spent on each task and the frequency that plaintiffs recalled performing the task.  Plaintiffs provided no records or time documentation for the underlying claims.  For the reader's convenience, that chart is provided herein.

| Task | Time claimed per task | Task daily frequency | Task weekly frequency | Total claimed weekly time |
|---|---|---|---|---|
| Physical examination | 10 minutes | 2 | 14 | 140 minutes |
| Grooming | 10 minutes | 1 | 7 | 70 minutes |
| Yard dog waste removal | 12 minutes | 2 | 7 | 84 minutes |
| Sanitize & disinfect yard | 45 minutes | Monthly task | .25 | 11 minutes |
| Fence inspection & hole filling | 22 minutes | Weekly task | 1 | 22 minutes |
| Teeth | 16 minutes | Weekly task | 1 | 16 minutes |
| Flea & parasite control | 11 minutes | Weekly task | 1 | 11 minutes |
| Bathing dog | 23 minutes | Weekly task | 1 | 23 minutes |
| Medication & nutrition supplements | 1.5 minutes | 1 | 7 | 11 minutes |
| Exercise before work | 11 minutes | 1 | 7 | 77 minutes |
| Exercise after work | 21 minutes | 1 | 7 | 147 minutes |
| Basic control training | 8 minutes | 5 times per week | 5 | 40 minutes |
| Feeding | 11 minutes | 1 | 7 | 77 minutes |
| Exercise off duty | 30 minutes | 2 | 7 | 210 minutes |
| Training off duty | 40 minutes | 2 times per week | 2 | 80 minutes |
| Daily vehicle cleaning | 24 minutes | 5 times per week | 5 | 120 minutes |
| Weekly vehicle disinfection | 120 minutes | Weekly task | 1 | 120 minutes |
| Home vacuuming & cleaning | 12 minutes | 1 | 7 | 84 minutes |
| Home flea & parasite prevention | 26 minutes | Monthly task | .25 | 7 minutes |
| Lawn & yard maintenance | 45 minutes | 3 times per year | .165 | 7.43 minutes |
| **Total Weekly Claim** | **1,356.7 minutes per dog** | | | |
| **Average Daily Claim** | **3 hours & 13.81 minutes per dog each day** | | | |

The reasonableness and accuracy of plaintiffs' claims are discussed below.

b.   **The plaintiffs' calculations for off-duty police service dog are flawed and do not present reliable data.**

1.   Plaintiffs make several errors of time economy calculation.[1]  First, plaintiff claims 11 minutes per day for feeding.  It is unlikely that the actual feeding of the police service dog requires more than five minutes per day.  Most police service dogs are fed once daily at the end of shift or shortly thereafter.  This allows proper digestion prior to beginning a new work day.  It is undesirable to leave extra food in the bowl.  Thus, it is good practice to check the food bowl after a brief time.  During this time, other tasks can easily be accomplished.

2.   Many dogs will select an area within their own home territory for defecation. Most police service dogs can easily be trained to limit the area of defecation.  This minimizes the time required for waste collection.  A police service dog should not be fed common dog food.  A police service dog expends substantial energy during an active duty shift and the dog requires a high-quality food with a high percentage of animal protein (not cereal proteins) and essential nutrients.  Generally, the higher quality dog foods result in much less and more solidly-clumped dog waste, easing waste collection.

---

[1] Plaintiffs' exercise calculations are based on certain questionable assumptions or erroneous mathematical calculations.  For example, the largest block of time claimed by plaintiffs for any one daily task is exercising each dog on off-duty days.  Plaintiffs claim that this task occurs two times per day, seven days per week.  The most apparent flaw with that claim is that plaintiffs are assigned to work with their dogs on four days per week.  Thus, the actual number of off-duty days that each dog should be exercised is three, assuming arguendo that daily exercise is necessary and is actually performed.

*Krause & Martin v. Manalapan Township*
*Report of Kenneth R. Wallentine*          6

3.    An economic routine for feeding and other tasks should involve dispensing the dog's food, freshening the dog's water bowl (unless an automatic watering device is used) checking the yard for hazards, an occasional quick inspection of the fence and gate and dog waste collection. After these tasks are completed, the handler should check the dog bowl for any remaining food. This is also a prescribed time to conduct a quick physical examination of the dog.

4.    It is possible to perform other tasks during this time, such as application of flea and tick prevention, depending on the dog. In some areas of the country, including New Jersey, fleas and ticks are prevalent, more so in certain seasons. Though a collar-type flea and tick preventative may be used for a police service dog, a topical application is generally preferred. During high season for fleas and ticks, or after the dog becomes soaked by rain or in standing water, this may need to be done more frequently. One common effective and economical method is the use of a flea and tick wipe. These wipes are similar to disinfecting wipes or baby wipes. The wipes are impregnated with a flea and tick preventative. Application is quick and simple, involving a wipe over the dog's top coat, and can often be done at feeding time.

5.    It is my experience from keeping several dogs (one at any given time) in a fenced back yard, and from supervising others who kept dogs at home, that the several aforementioned tasks may be easily completed in a single routine of 15 to 20 minutes. Even less time may be required, depending on nutritional needs, watering method, kennel surface, yard size, fence quality and other factors. This experience

is consistent with reports provided to me by many other police service dog handlers. This time period is also consistent with training that is commonly provided to police service dog handlers regarding the decisions of many trial and appellate courts considering the issue of home care for a police service dog. Daily gate inspection and yard inspection are not generally required, depending on the character of the fence, neighborhood, and likelihood of tampering with the premises. If the fence is in such condition that loose boards are a common occurrence, the fence should be repaired or replaced. In most situations, twenty minutes is more than adequate for feeding, waste collection, yard, kennel and gate inspection, cursory inspection of the dog for injury or illness, and checking the food consumption. The inspection can effectively be combined with grooming, feeling the dog's body during brushing and combing.

6.    Plaintiffs claim 22 minutes per week per dog to maintain fences and fill holes. Residential fences of a reasonable quality typically do not require weekly maintenance. A police service dog should not be allowed to live in a yard with a substandard fence that requires constant maintenance or is easily damaged by the police service dog or other forces. There is nothing in the material presented to me to confirm that the significant amount of time claimed for cleaning, filling holes, yard maintenance and waste disposal are not compounded by the presence of two other dogs at each plaintiff's home. This may well contribute to the holes that are dug.

*Krause & Martin v. Manalapan Township*
*Report of Kenneth R. Wallentine*       8

7.    If plaintiffs were expending a considerable amount of time, approximately one and one-half hours per month, filling holes dug by the police service dog, this suggests poor training, handling and/or neglect of the police service dog. Dogs dig holes for many reasons. The principal reasons include an instinctive behavior to create a secure environment (known as a "denning instinct" and more common to female dogs), provide a cool shelter from the heat and to relieve frustration or boredom. None of these reasons should be present in a well-trained and properly maintained police service dog. A police service dog should have an individual kennel or house where the dog can retreat to a place of comfort and security, eliminating the instinct to dig a den for security. The dog's home and general environment should provide shade and weather shelter, eliminating the issue of heat relief. Police service dogs should never dig because of frustration or boredom. The 36 hours of working time each week that each plaintiff spends directly interacting with their respective assigned police service dog, coupled with a reasonable amount of daily contact during off-duty days, are more than enough to avoid frustration and boredom. Though there may be other causes for digging behavior, the behavior can almost always be eliminated through training techniques known to skilled dog trainers and police service dog handlers.

8.    Most police service dog handlers do not exercise their dogs for 60 minutes per day on days off from work. That amount of formal exercise, particular when other formal obedience training and maintenance training is conducted, is not necessary to maintain the dog's physical conditioning. However, that doesn't mean that the

dog is not getting exercise. The dog should be allowed time in a yard or park to run and play on his own. Plaintiffs' depositions suggest living conditions that allowed the dogs to do so. Additionally, each had other dogs living with them. This allowed socialization and play as a canine group, providing even more opportunities for dog exercise.

9.      Training that reinforces and advances the police service dog's work assignment, such as detection of the odors of illegal drugs, building searches, tracking, handler protection, suspect apprehension and similar tasks, is commonly referred to as "maintenance training." I have never encountered a police service dog handler who spent 80 minutes per week on maintenance training on off-duty days. It simply is not done on off-duty time. It is not necessary to the performance of the police service dog mission.

10.     Plaintiffs state that each dog is bathed weekly. In almost all cases of police service dog work, this is not only unnecessary, but unhealthy and is not recommended by knowledgeable dog trainers and veterinarians. A dog's coat has essential oils that help keep the dog warm and keep the coat–and the dog–buoyant in water. Bathing more than once per month is generally damaging to the coat. The dog can only produce the essential oils at a certain pace. More frequent baths damage the underlying skin, drying it out, even when the highest quality canine formulation shampoo is used. I have even known one veterinarian to recommend a bath no more than once or twice a year unless the dog gets fleas or ticks. Daily grooming, as plaintiffs note that they perform, and proper flea and tick preventatives are more

important to the dog's health than too-frequent baths. Brushing and combing out mats stimulates the skin, removes dead hair, minimizes shedding and stimulates the dog's coat. Some dog owners make the serious mistake of bathing the dog when the dog stinks. Dogs stink; they're dogs, after all. Dogs do not like frou-frou shampoo odors. Many scents irritate the dog. Some dog owners are surprised when a freshly-shampooed dog heads for a pile of excrement, but the dog just wants to smell like a dog, even if it means rubbing feces. When dogs sniff each other, they don't sniff the coat for the shampoo. They sniff elsewhere. A dog's odor is natural. Some animal behaviorists posit that the dog's natural odor is important to the dog's perception of its place in the social order. It is vital that a police service dog performing odor detection (narcotics, explosives or other odors) *not* be bathed frequently with a shampoo carrying even a slightly distracting odor.

11.    Plaintiffs claim an unusually high amount of time per week spent in cleaning. Plaintiffs each claim four hours per week per dog for cleaning and sanitizing the police cars. Wiping down the inside of a police service dog vehicle kennel may or may not be necessary on a daily basis, depending on the working conditions and weather conditions. Nonetheless, such cleaning can easily be performed with single-use disinfecting wipes in a matter of a couple of minutes. A more thorough cleaning should typically be done every one or two weeks, again depending on individual conditions. Vacuuming the inside of the car and cleaning the inside of the windows might require 20 minutes each time, start to finish, retrieving and

*Krause & Martin v. Manalapan Township*
*Report of Kenneth R. Wallentine*          11

replacing the vacuum and window cleaning equipment. This assumes that plaintiffs personally performed the cleaning and did not use a commercial car wash service while on duty, as is common practice. Two hours per week for disinfection to prevent contamination of medical equipment is unnecessary and unreasonable. If there is sensitive medical equipment stored in the police car, there are methods to protect the equipment or place it in the trunk away from the dog.

12.   The plaintiffs' spouses were fortunate to have considerate partners who vacuumed and cleaned the house daily. Daily vacuuming and cleaning is not a typical necessity for a home with a police service dog (for those dogs where the handler chooses to keep the dog in the home and not in an exterior kennel which was not requested by the plaintiffs). Some additional cleaning is necessary, but not nearly one and one-half hours per week. Both plaintiffs acknowledge that they kept other dogs in the home. These dogs likely spent far more time in the home, since they did not accompany plaintiffs to work, and accordingly would have significantly contributed to the need for cleaning and vacuuming.

13.   Plaintiffs discuss their decisions to take the police service dogs on family vacations. This should not be necessary. A well-trained police service dog should be sufficiently controlled and trained to not be aggressive without provocation or command from the handler. Some police agencies provide a central department kennel for housing during a handler's vacation time. Most arrange for commercial kenneling care at a veterinarian's office or other animal care facility. I am aware of many handler's who care for a partner handler's dog during vacation time. There

should be no concern in temporarily housing a police service dog in a reputable commercial kennel. There was no evidence in the materials presented to me, including plaintiffs' deposition testimony, that either plaintiff had asked the other to care for his assigned police service dog during a vacation. Nor was there any evidence that plaintiffs ever requested commercial kenneling of their assigned dogs during a vacation.

c. **Many of the canine care tasks claimed to be performed off-duty could and should be performed on duty time for the benefit of the dog and efficiency of the police service dog unit.**

1. Maintenance training of a police service dog, whether a patrol/apprehension dog or detector dog, must almost always be conducted with at least two persons. For example, if the training is for suspect location and apprehension a decoy is essential to the training. It is also preferable to have a trainer, or at least a second handler, to observe and critique the performance of the handler and the dog. Diligent police service dog handlers will go to great lengths to coordinate training with other handlers so that the full benefit of group training may be achieved. Training records for the Manalapan Township Police Department dogs showed that plaintiffs often joined handlers from other agencies to facilitate training. This training should happen on duty time.

2. A police service dog handler should begin each shift with a routine that communicates to the dog that it is time to go to work. This routine typically includes a quick inspection of the dog, an opportunity to exercise and stretch and

to void bladder and bowels. This is also an opportune time for the brief, regular basic obedience drills, such as heeling, sitting, downing and staying. A police service dog handler is not generally expected to perform basic obedience drills and specialty training during off-duty hours. A well-trained police service dog does not require daily narcotics and apprehension training and, by definition, does not require daily obedience training.

3.  A reasonable and conscientious police service dog handler will develop a routine that allows many tasks to be quickly performed in an economical manner. For example, the police service dog can eat while the handler is picking up waste and inspecting the fence. The following chart provides an example of such economy of time.

| Task | Time to reasonably accomplish task | Task daily frequency | Task off-duty weekly frequency | Off-duty weekly time reasonably required |
|------|------|------|------|------|
| Physical examination | 5 minutes | 2 on-duty/1 off-duty | 3 | 15 minutes |
| Grooming | 10 minutes | 1 | 3 | 30 minutes |
| Yard dog waste removal | 6 minutes | 1 | 3 | During feeding |
| Sanitize & disinfect kennel area | 20 minutes | As needed | .25 | 5 minutes |
| Fence inspection & hole filling | 3 minutes | Weekly task | | During feeding |
| Teeth | 16 minutes | Weekly task | 1 | 16 minutes |
| Flea & parasite control | 6 minutes | Weekly task | On-duty only | None[2] |
| Bathing dog | 23 minutes | Bi-monthly or less task | .1 | 2.3 minutes |
| Medication & nutrition supplements | 1.5 minutes | 1 | 7 | 10.5 minutes |
| Exercise before work | None | 1 | On-duty only | None |
| Exercise after work | None | 1 | On-duty only | None |
| Basic control training | None | 4 times per week | On-duty only | None |
| Feeding | 10 minutes | 1 | 7 | 70 minutes |
| Exercise off duty | 10 minutes | 1 | 3 | 30 minutes |
| Training off duty | None | None | On-duty only | None |
| Daily vehicle cleaning | 10 minutes | 4 times per week | On-duty only | None |
| Weekly vehicle disinfection | 20 minutes | Weekly task | On-duty only | None |
| Home vacuuming & cleaning | 10 minutes | 1 | 2 | 20 minutes |
| Home flea & parasite prevention | 60 minutes | Semiannual task | De minimis | De minimis[3] |
| Lawn & yard maintenance | None | Not usually required | | None[4] |
| **Total Weekly Off-duty time** | **198.8 minutes, or 3.3 hours** | | | |

---

[2] This task can also be done during grooming for many dogs, particularly when flea wipes are used.

[3] Products available for consumer application in homes where fleas and parasites are a problem generally recommend application every six months. Normal housekeeping often prevents the need for such products. The flea and parasite problem may arise when other dogs are present.

[4] A properly-trained police service dog does not dig holes and does not create extraordinary yard maintenance needs. Plaintiffs, however, kept multiple other dogs in the yard.

*Krause & Martin v. Manalapan Township*
*Report of Kenneth R. Wallentine*          15

4.     The evidence presented to me in the documents and in plaintiffs' deposition testimony offers no reason that the tasks listed above as being performed during duty time could not have, in fact, been done during work hours. Although practices vary from agency to agency, nothing in the Manalapan Township Police Department police service dog policy required tasks such as daily vehicle cleaning or weekly vehicle sanitation to be performed off-duty. Certain time claimed for cleaning, including the sanitation of medical equipment, could have been avoided or minimized by protecting the medical equipment with proper packaging.

5.     The time actually required for a reasonable police service dog handler to perform tasks that must generally be performed off-duty is less than the time allotted by the Manalapan Township Police Department for police service dog off-duty care.

d.   **The time required to care for a police service dog during off-duty hours varies significantly by region, assignment and home care circumstances and there is no single fixed, nationally-recognized time calculation. The time claimed by plaintiffs significantly exceeded the time allotted by other area police agencies.**

1.     Few efforts have been made to authoritatively establish a time required for reasonably necessary work for maintaining a police service dog. Several years ago, in preparation for an article addressing the Fair Labor Standards Act and canine handlers, my research and teaching colleague and I conducted a survey of approximately thirty police departments nationwide. The sampled departments were not selected in any rigid scientific fashion. In fact, it may be argued that the surveyed departments were more likely to have considered the reasonably

necessary maintenance time and arrived at an arrangement mutually satisfactory to the handler and the department. This is because most of the departments surveyed were identified through my work with dozens of agencies who were committed to invest substantial monies in advanced tactical and narcotics detection training for their canine teams. Although I have heard of others' opinions on the subject, I am not aware of any research into this subject beyond this survey and the continuing collection of survey data by my colleague and me. Since 1997, my colleague and I have collected data on police service dog home care time arrangements from more than 1,000 police service dog handlers and administrators from across the United States.

2.    Survey respondents represented a variety of demographics, from rural to urban, large municipal forces to small county agencies, and state, local, and federal agencies. One of the compensation issues most frequently raised was home care time. Most departments surveyed allotted between three-quarters and one hour per workday, most using a four day work week, for off-duty care. This was particularly common in larger departments with multiple canine teams, such as Harris County, Texas, Sheriffs Office (metropolitan Houston) and the St. Louis Metro Police Department. Many agencies allowed a shorter work day, such as nine hours in place of ten, rather than pay an additional hour per day on days off. Some departments pay time at a reduced rate, recognizing that law enforcement skills are not required to perform kennel cleaning and canine feeding.

3.      Other police agencies in the area of Manalapan Township compensate police service dog handlers at a level comparable to the generally-accepted averages across the nation.  For example, the Wall Township Police Department provides an additional 15 hours per month to each police service dog handler to compensate for canine care, slightly less than the time allocated by the Manalapan Township Police Department.  The Brick Township Police Department provides an additional eight hours per month to each police service dog handler to compensate for canine care, also less than the time allocated by the Manalapan Township Police Department.  These agencies' policies are particularly instructive in making a comparison with prevailing practices that are generally accepted in the region.

4.      I spend several weeks each year working with various police departments, sheriffs' offices and federal agency representatives throughout the United States on canine issues.  I also spend additional time teaching at the Utah Police Academy in a variety of canine courses, including basic patrol dog, narcotics detector dog, and certified canine unit administrator courses, as well as occasionally teaching seminars outside the state.  The Utah Police Academy is well-known for the police service dog training program and students are drawn from throughout the intermountain western states.  I frequently discuss with officers and supervisors how they address the Fair Labor Standards Act and canine care on off-duty days.  Policies identical or very similar to the Manalapan Township Police Department arrangement are quite common among the responses from these police service dog handlers and supervisors.

*Krause & Martin v. Manalapan Township*
*Report of Kenneth R. Wallentine*                18

2.      In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  My qualifications, publications, litigation history and fee schedule are recited herein.

3.      **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  My primary employment is for the Utah Attorney General, where I serve as Chief of Law Enforcement.  I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah, and supervised the police service dog training and certification program.  I also had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.  I was certified as a law enforcement officer in the State of Utah in 1982.  My duties include direct supervision and command of three Investigation Sections, supervising approximately thirty-five law enforcement officers, forensic specialists, and technicians, as well as a number of other employees.  I command the State of Utah Child Abduction Response Team.  I command the State of Utah Officer-Involved Fatality Investigation Team.  I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations.  In 2010, Governor Herbert selected me for the 2009 Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy.  I

*Krause & Martin v. Manalapan Township*
*Report of Kenneth R. Wallentine*          19

continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses. I am a certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor.

5.      I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I am an adjunct Professor of Law at Brigham Young University, teaching Criminal Procedure and supervising

directed research. I am on the adjunct faculty of Excelsior College, teaching Criminal Procedure,

Evidence and Management Strategies for Public Safety and am responsible for course design and

curriculum selection for Criminal Procedure.

6.       In addition to my primary employment, I occasionally consult and provide expert witness

opinions on police procedures, and use of force issues. I occasionally perform in-custody death

investigations and officer-involved shooting death investigations for agencies which may lack the

requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the

state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring

and screening practices, use of force, and police pursuit policies. I am the co-founder of, and

legal advisor to, a best practices advisory group that developed comprehensive model policies and

best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs'

Association and various state law enforcement agencies. These policies serve as a model for all

Utah public safety agencies. I occasionally perform in-custody death investigations and officer-

involved shooting death investigations for agencies which may lack the requisite expertise. I am

the author of a number of model policies for law enforcement agencies, and have provided policy

drafting and policy review services for several agencies, including policy drafting responsibility for

large law enforcement agencies. I am a program and grant reviewer for the Office of Justice

Programs, United States Department of Justice. I have also served as a contract consultant to the

United States Department of Justice, assigned to provide technical assistance and management

consulting to various public safety entities in the United States.

7.       I participate and serve in a number of community and professional capacities. I am a

member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national

scientific best practices organization sponsored by the Federal Bureau of Investigation, the

Department of Homeland Security, and the Transportation Security Administration, with support

coordinated by the International Forensic Research Institute at Florida International University.

Other professional activities pertinent to law enforcement include serving as a Past-President of

the Utah Peace Officers Association, former Board Member of the Utah SWAT Association,

member of the International Association of Law Enforcement Educators and Trainers

Association, member of the International Association of Chiefs of Police and the Utah Chiefs of

Police Association, member of the National Tactical Officers Association, member of the

International Association of Law Enforcement Firearms Instructors, member of the International

Association of Directors of Law Enforcement Standards and Training, member of the

International Law Enforcement Educators and Trainers Association, member of the K9 Section of

the Utah Peace Officers Association, member of the United States Police Canine Association, past

member of the board of directors of the NAACP, Salt Lake City branch, and board member and

immediate past-Chairman of the Utah Law Enforcement Legislative Committee.  I formerly

served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.  I

currently frequently serve as a member *pro tempore* of the Council on Peace Officer Standards

and Training.

8.      Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the

International Police Canine Conference.  My principal responsibilities are to provide use of force

training, civil liability instruction, and search and seizure instruction.  In the past year, I have

provided police service dog training and certification standards consultation for two police service

dog organizations, including a western regional group and one of the major national groups.  I

serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.       I am a Senior Legal Editor for Lexipol, Inc., the nation's largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies. In that capacity, I have assisted in the drafting and review of police service dog policies in current use by hundreds of police agencies in the United States.

10.      **My publications (limited to ten years) include the following:**  I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, was published by Lexis/Nexis Matthew Bender in December 2008. It includes an extensive discussion of use of force by police officers. Another recent book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, August 2010; *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, January 2010; *Targeting TASER: The New TASER Aim Points*, Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009;

*Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; *The New Paradigm of Firearms Training*, IADLEST News, Spring 2001; *Use of Deadly Force Instructor Curriculum* (monograph), POST, Spring 2001; *Pepper Spray as Use of Force*, Police, October 2000; *Are Drug Courts the Wave of the Future?*, Police, April 2000; and a variety of columns addressing law enforcement issues and published by PoliceOne.com.  I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005).  This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11.    **My fee schedule is established as follows:** I charge $200.00 per hour for document review, witness and officer interviews, report preparation, testimony preparation, and consultation.  I charge $250.00 per hour for administrative tribunal, deposition or court

testimony. I bill for actual travel expenses and a travel fee of $1,000.00 per day for travel to western states and $1,500.00 per day outside western states.

12.     **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010. Trial testimony given on behalf of defendants. Subject matter: excessive force. *Al-Asadi v. City of Phoenix, et al.*, No. 2:09-CV-00047, United States District Court of Arizona, 2010. Deposition testimony given on behalf of the defendants. Subject matter: excessive force and propriety of an arrest. *United States v. Beltran-Palafox*, No.09-40022-01/02 JAR, United States District Court of Kansas, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Trestyn & Herren*, No. 09-CR-00216-B, United States District Court of Wyoming, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Divisio , 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper execution of search warrant, negligent investigation. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-

DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper search and excessive force. *Becker v. Bateman*, Case No. 2:07-CV-311 PGC, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: excessive force. *Salva v. Kansas City Board of Police Commissioners*, Case No. 07-CV00194-JTM, United States District Court of Missouri, Western Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Turnbow v. Ogden City et al.*, Case No. 1:07-CV-114, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Nielson v. South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct. *Trammell v. Jacksonville Beach City Police Department*, Case No. 3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs. Subject matter: excessive force. *Harman & Overton v. Utah Department of Public Safety*, Case No. 2:03CV00558TC, United States District Court of Utah, Central Division, 2007. Deposition testimony given on behalf of the defendants. Subject matter: wrongful search, negligent investigation. *Herring v. City of Colorado Springs*, Civil No. 04-CV-024229-PAC-BNB, United States District Court of Colorado, 2005. Deposition testimony given on behalf of the defendants. Subject matter: excessive use of force, wrongful death.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiffs' experts, and further investigation. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

The four hours paid per week by the Manalapan Township Police Department are adequate for the basic canine care duties required by the department, considering the availability and practice of paid overtime for extraordinary canine care needs such as canine team callback time. The time allotted for canine care by Manalapan Township Police Department and provided in the governing collective bargaining agreement is consistent with many similarly situated law enforcement agencies. Manalapan Township Police Department's canine care compensation practices are not unreasonable under police service dog industry standards.

Kenneth R. Wallentine
November 2, 2010

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123

*Krause & Martin v. Manalapan Township*
*Report of Kenneth R. Wallentine*          28

# Wall Township Police Department

| SUBJECT:<br>K9 Operations and Procedures | GENERAL ORDER:<br>2007- 27 | |
|---|---|---|
| DATE ISSUED:<br>October 15, 2007 | PERSONNEL ORDER: | |
| DATE EFFECTIVE:<br>October 15, 2007 | | |
| DISTRIBUTION:<br>All Personnel | MEMORANDUMS: | |
| ISSUED BY:<br>Sgt. S. DesMarais | | |
| APPROVED BY:<br>Chief D. Morris | TRAINING BULLETIN: | |
| PROMULGATED BY:<br>Admin. Verruni | | |
| SUPERSEDES: 2006-092005-03,1998-06,1998-04, 1994-22,1993-21, A620 and L116 | 21 | |

Effective immediately and until further notice, this General Order shall apply to K9 operations and procedures.

POLICY:

It shall be the policy of the Wall Township Police Department to provide for the positive and efficient utilization of the Department's K-9 teams in a manner that will be most effective in attaining the Department's goals in serving the community.

The use of a canine is a legitimate tool in attaining the goals of law enforcement in our society. The canine team's greatest value lies in the deterrent effect of their presence.

All members of the Department must bear in mind that the use of a canine team in making or maintaining an arrest constitutes the use of force of the implied use of force. Therefore, it is imperative that the canine handler be fully cognizant of all the facts and circumstances available surrounding the situation before a decision is made to deploy the canine for other than deterrent patrol.

PURPOSE

The primary mission of the K-9 Unit is to provide trained canine teams to assist in the prevention and detection of crime, the tracking of persons sought by the police, protection

1

        d.    In the event of a life threatening injury to the K9 officer, and there is no other alternative available, the K9 will be destroyed so prompt medical attention can be given to the injured officer.

  B.    Nothing in this policy shall prevent the K9 from being used under circumstances where a reasonable person would deem it to be justified.

X.    K9 on call vehicle assignments

    The department K9 Team that is scheduled as the <u>ON-CALL UNIT</u> will keep their assigned K9 vehicle at their primary residence.

  1.    The assigned K9 vehicle will only be parked, secured and left unattended at the officers primary residence located within Wall Township.

  2.    The vehicle will only be utilized to transport the canine team dog and handler combined.

  3.    No passengers are permitted other than police personnel or those specifically authorized by a supervisor.

  4.    Whenever the vehicle is utilized, the assigned officer will report in and out of service with the Department's Dispatch Center or by OSSI entry/event.

  5.    In a call-out situation the assigned officer will also notify the duty supervisor in reference to authorizing overtime documentation. This may be documented by generating an OSSI event.

  6.    If the vehicle must be taken out of town for department purposes, the assigned officer will get authorization from the duty supervisor.

  7.    The canine unit officer will be directly responsible for the maintenance of the K9 vehicle and equipment.

  8.    The K9 unit supervisor will be responsible for maintaining an updated accurate on-call schedule available to the dispatch center, duty supervisors and department administration.

XI.    Kennel time compensation

Police Officers of the Wall Township Police Dept. that are assigned to the K9 Unit are to be allocated kennels for their use in the care of their K9 dogs. The kennels are to be placed at the police officer's primary residence and will be utilized exclusively for use by the Department owned and maintained K9 dog.

20

The K9 handler will be responsible for the following, considered to be part of their kennel time responsibilities:

    A.    The care and maintenance of the K9 dog, both on and off duty
    B.    Trips to veterinarian appointments, grooming, feeding, and general exercise. Maintenance of this nature is usually conducted on off-duty time.
    C.    Training will be conducted during on-duty hours.

In accordance with the Fair Labor Standards Act and existing case law, this department is to compensate police officers assigned to the K9 unit for care and maintenance of the K9 dog during the officer's off-duty time. The Wall Township Police Department will allow the K9 handler to accumulate thirty minutes of granted time off per calendar day or fifteen hours of compensatory time per month added to his comp bank. For the purpose of K9 Compensation, the 15 hours will be accumulated as straight time and not at a rate of 1 ½ hours. Requests for this granted time off will be submitted to the handler's immediate supervisor and will be subject to established policies for granting time off, i.e. manpower concerns.

XII.    Disposition of retired K9 dogs

    A.    In the event a K9 dog reaches an age where it is no longer suitable for police service, is disabled for any reason, or is retired for any other reason, the K9 handler may elect to obtain ownership of the K9 dog. The K9 handler assumes all responsibility for the dog. The officer will sign a Wall Township Police department "Transfer of K9 Ownership" form specifying the conditions of the transfer.

    B.    The K9 handler, as new owner of the retired K9 dog, is entitled to compensation in the form of a monetary stipend, not to exceed two hundred ($200.00) dollars per year, for annual veterinary expenses. This compensation serves as a reward for service time and its faithful service to the community.

    C.    All procedures heretofore employed by this Department that conflict with this Order are hereby rescinded.

CLOSING

    All police procedures heretofore employed by this Department, which conflict with this order, are hereby rescinded

21

# TOWNSHIP OF BRICK

OCEAN COUNTY, NEW JERSEY
401 CHAMBERS BRIDGE ROAD, BRICK, N.J. 08723



RECEIVED
OCT 18 2010
Office of the Municipal Clerk

**Stephen C. Acropolis, Mayor**

**Township Council:**
  Anthony Matthews -- President
  Dan Toth -- Vice President
  Domenick Brando
  Brian DeLuca
  Joseph Sangiovanni
  Ruthanne Scaturro
  Michael A. Thulen, Sr.

Lynnette A. Iannarone, RMC, CMR
Municipal Clerk
732-262-1002
clerk@twp.brick.nj.us

Jessica L. Larney, RMC, CMR
Assistant Municipal Clerk
732-262-1003
jlarney@twp.brick.nj.us
www.twp.brick.nj.us

October 14, 2010

Ryan J. Mowll, Esq
McLaughlin Gelson
1305 Campus Parkway, Suite 200
Wall, NJ 07753

Re:   OPRA #173-10
      Compensation for K-9 Police Handlers

Dear Mr. Mowll,

I am in receipt of your request for records regarding the above dated October 1, 2010. Please be advised that our office has been notified that:

1. The Police Department follows the Garcia Rule and grants K-9 officers eight hours of compensation time per month for K-9 maintenance.

2. Enclosed is a spreadsheet listing all K-9 Handlers' salaries from 2002-2010.

If I can be of further assistance do not hesitate to contact me.

Sincerely,

Jessica L. Larney, RMC
Assistant Township Clerk



00426

K9 Police Officers - Salaries 2002 -2010

### Ptl. Ronald Braen

| Year/Name | Base | Longevity | Total |
|---|---|---|---|
| 2002 | $80,746.00 | 11.50% | $90,032.00 |
| 2003 | $83,976.00 | 11.50% | $93,633.00 |
| 2004 | $87,335.00 | 11.50% | $97,379.00 |
| 2005 | $90,828.00 | 11.50% | $101,273.00 |
| 2006 | $94,461.00 | 11.50% | $105,324.00 |
| 2007 | $98,239.00 | 11.50% | $109,536.00 |
| 2008 | $102,169.00 | 11.50% | $113,918.00 |
| 2009 | $105,745.00 | 11.50% | $117,906.00 |
| 2010 | $109,446.00 | 11.50% | $122,032.00 |

### Ptl. Jeffrey Fornarotto

| Year/Name | Base | Longevity | Total |
|---|---|---|---|
| 2002 | $73,514.00 | 7% | $78,660.00 |
| 2003 | $76,455.00 | 7% | $82,207.00 |
| 2004 | $79,513.00 | 11.50% | $89,057.00 |
| 2005 | $82,694.00 | 11.50% | $92,604.00 |
| 2006 | $86,002.00 | 11.50% | $96,292.00 |
| 2007 | $98,239.00 | 11.50% | $109,936.00 |
| 2008 | $102,169.00 | 11.50% | $114,318.00 |
| 2009 | $105,745.00 | 11.50% | $118,306.00 |
| 2010 | $109,446.00 | 11.50% | $122,432.00 |

### Sgt. Steven Gerling

| Year/Name | Base | Longevity | Total |
|---|---|---|---|
| 2002 | $73,514.00 | 3.50% | $76,737.00 |
| 2003 | $76,455.00 | 4% | $79,513.00 |
| 2004 | $79,513.00 | 4% | $83,344.00 |
| 2005 | $82,694.00 | 5% | $87,479.00 |
| 2006 | $102,922.00 | 5% | $108,718.00 |
| 2007 | $107,039.00 | 6% | $114,111.00 |
| 2008 | $111,321.00 | 6% | $118,650.00 |
| 2009 | $115,217.00 | 6% | $122,780.00 |
| 2010 | $119,250.00 | 7% | $128,248.00 |

### Ptl. Jeffrey Lempicki

| Year/Name | Base | Longevity | Total |
|---|---|---|---|
| 2002 | | | |
| 2003 | | | |
| 2004 | | | |
| 2005 | | | |
| 2006 | | | |
| 2007 | $89,442.00 | 4% | $93,020.00 |
| 2008 | $93,020.00 | 4% | $96,741.00 |
| 2009 | $96,276.00 | 5% | $101,090.00 |
| 2010 | $99,645.00 | 5% | $104,627.00 |

### Ptl. Erik Skoog

| Year/Name | Base | Longevity | Total |
|---|---|---|---|
| 2002 | | | |
| 2003 | $76,455.00 | 4% | $79,913.00 |
| 2004 | $79,513.00 | 4% | $83,094.00 |
| 2005 | $82,694.00 | 5% | $87,229.00 |
| 2006 | | | |
| 2007 | | | |
| 2008 | | | |
| 2009 | | | |
| 2010 | | | |

### Ptl. Michael Spallina

| Year/Name | Base | Longevity | Total |
|---|---|---|---|
| 2002 | | | |
| 2003 | $73,514 | 4% | $76,455.00 |
| 2004 | | | |
| 2005 | | | |
| 2006 | | | |
| 2007 | | | |
| 2008 | | | |
| 2009 | | | |
| 2010 | | | |

Kenneth R. Wallentine
Disclosure information for Fed. R. Civ. P. 26
May 2010

*Curriculum vita*

*Employment*

I am a law enforcement administrator in the State of Utah. My primary employment is for the
Utah Attorney General, where I serve as Chief of Law Enforcement. I am also employed as a
Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk
management resources. I was formerly employed as Investigations Bureau Chief at the Utah
Department of Public Safety, Peace Officer Standards and Training Division, where I supervised
investigations into allegations of improper conduct, excessive force, officer integrity, and criminal
acts alleged to have been committed by certified and certifiable law enforcement officers. I also
had responsibility for policy drafting and review for the parent agency, the Utah Department of
Public Safety. I was certified as a law enforcement officer in the State of Utah in 1982. My
present duties include direct supervision and command of three Investigation Sections,
supervising approximately thirty-five full-time and ten part-time law enforcement officers, forensic
specialists, accountants and technicians directly in my employ, as well as several other law
enforcement officers assigned to my agency in cooperative interagency agreements or task forces.
I command the State of Utah Child Abduction Response Team and administer related training
programs and grant funding for local entities. I am a member of the Board of Reviewers of the
Utah Technical Assistance Program, providing consultative services in cold case homicide and
missing persons cases. In 2010, Governor Gary Herbert selected me for the annual Governor's
Award for Outstanding Public Service.

*Law enforcement teaching experience*

I was formerly responsible for providing delivery of the Basic Training Curriculum related to all
legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I
continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy
curriculum currently in use for several subjects, including, but not limited to, use of force,
reasonable force, use of force and police service dog teams, search and seizure, search and seizure
for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the
Basic Training programs of the Utah State Police Academy. I regularly teach in the following
specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy,
Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First
Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler
Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog
handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to
provide instruction and evaluation services for the POST Police Service Dog program. I am a
certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms
courses. I am a certified TASER® Instructor. I am a certified Excited Delirium and Sudden
Death Investigation Instructor. In cooperation with the Utah Sheriffs Association and the Utah

Jail Commanders Association, I teach employee selection, employee discipline, internal affairs and in-custody and officer-involved fatality investigation courses to county law enforcement and corrections command staff.

Since 1994, I have been a staff member of the K9 Academy for Law Enforcement and the International Police Canine Conference. I am a former police service dog (patrol and narcotics) dog handler. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. In the past few years, I have restricted my travel outside the State of Utah, but have continued to provide use of force, civil rights liability, and search and seizure law enforcement training in Arizona, Iowa, and California. Over the past several years, I have lectured and trained police officers and administrators from Wyoming, Arizona, Connecticut, Florida, North Carolina, South Carolina, Iowa, Texas, Utah, Colorado, Alabama, Louisiana, Nevada, New York, New Hampshire, Vermont, Rhode Island, Maine, Delaware, Wisconsin, Michigan, Indiana, Washington, Oregon, Nebraska, Georgia, California, Nevada, and Idaho.

*Legal practice*

I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am an adjunct Professor of Law at the J. Reuben Clark School of Law, teaching criminal law and procedure. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as immediate past-President of the Inn of Court. I am an appointed Administrative Law Judge for the State of Utah, presently in inactive status due to my employment with the Attorney General. I have served both as a Hearing Officer and as the advising Administrative Law Judge for appeals before the Utah Career Service Review Board. I also am an active Administrative Law Judge appointed in certain counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct and other police employment matters.

*Consultation practice*

In addition to my primary employment, I occasionally consult and provide expert opinions on police procedures, and use of force issues. I am on the adjunct faculty of Excelsior College, teaching Criminal Procedure and Management Strategies for Public Safety and a variety of other undergraduate courses in the School of Liberal Arts, Criminal Justice Department, and teach the occasional course for the English Department. I also provide course curriculum design services for Excelsior College's Criminal Justice Department. I provide law enforcement academy curriculum consulting and accreditation review services for the United States Department of Justice. I am a program and grant reviewer for the Office of Justice Programs, United States Department of Justice. I have also served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of

public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police agency policies. I am the co-founder of, and legal advisor to, a best practices advisory group charged with developing model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including full policy drafting responsibility for one of the state's larger law enforcement agencies.

## Professional activities and organizations

I am a member of the Scientific Working Group on Dog and Orthogonal Factors, a national standards organization facilitated by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with research and peer review coordinated by the International Forensic Research Institute at Florida International University. Other professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, consultant to and member of the California Narcotics and Explosive Canine Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, and member of the United States Police Canine Association. I have served as co-Chairman or Chairman of the Utah Law Enforcement Legislative Committee for the past six years. In that capacity, I have been involved with all major law enforcement legislative initiatives in the State of Utah for the past six years. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training, under Governor Michael Leavitt, where I heard many dozens of contested disciplinary matters. I currently serve as a member pro-tem on the Council on Peace Officer Standards and Training, under the appointment of the Attorney General.

## Publications

I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, was published by Lexis/Nexis Matthew Bender in December 2008. Another recent book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders* was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure. My other published works include: *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, August 2010; *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, January 2010; *Targeting TASER: The New TASER Aim Points*, Law Officer,

January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; *The New Paradigm of Firearms Training*, IADLEST News, Spring 2001; *Use of Deadly Force Instructor Curriculum* (monograph), POST, Spring 2001; *Pepper Spray as Use of Force*, Police, October 2000; *Are Drug Courts the Wave of the Future?*, Police, April 2000; *Legal Risks of Tactical Operation*, Police, April 1999; *Dogs of War (K9 Use of Force)/FLSA & K9 Handlers*, Police, December 1998/January 1999; *No-knock & Nighttime Searches*, Police, September 1998; *The Respectable Roadblock Ruse*, Police, June 1998; *If at First You Don't Succeed . . .*, Clark Memorandum, Fall 1998; *Preparing and Executing Search Warrants* (UPOA 1998); *Taking a Real Bite Out of Crime: Successful Risk Management for K9 Programs*, Utah Peace Officer, Summer 1996; *Lobbying, PACs and Campaign Finance* (West Publishing 1994), co-author; *Heeding the Call: Search and Seizure Jurisprudence Under Article I, Section 14, of the Utah Constitution*, 17 Utah Journal of Contemporary Law 267 (1991); *RICO & the Prime: Taking a Bite out of Crime?*, 2 Utah Bar Journal 7 (1991); *Margaret Bush Wilson and Shelley v. Kraemer*, 4 B.Y.U. J. Pub. Law 207 (1990); *Wilderness Water Rights: The Status of Reserved Rights After the Tarr Opinion*, 4 B.Y.U. J. Pub. Law 357 (1989); *Negligent Hiring: The Dual Sting of Pre-Employment Investigation*, 8 Utah B.J. 15 (1989), and a variety of columns addressing law enforcement issues and published by PoliceOne.com. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005).

*Four year litigation history*

I have testified and/or provided depositions in the following cases which are generally related to the subject of the instant litigation in the past four years: *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010. Trial testimony given on behalf of defendants. Subject matter: excessive force. *Al-Asadi v. City of Phoenix*, Case No.2:09-CV-00047-PHX-DGC, United States District Court of Arizona, 2010. Deposition testimony given on behalf of defendants. Subject matter: excessive force. *United States v. Beltran-Palafox*, Case No. 09-40022-01/02 JAR, United States District Court of Kansas, 2010. Court testimony given on behalf of the prosecution. Subject matter: improper training and whether a drug detector dog was reliable and whether the dog was cued. *United States v. Trestyn & Herren*, Case No. 09-CR-00216-B, United States District Court of Wyoming, 2009. Court testimony given on behalf of the prosecution. Subject matter: improper training and whether a drug detector dog was reliable and whether the dog was cued. *United States v. Ludwig*, Case No. 08-CR-224-D, United States District Court of Wyoming, 2009. Court testimony given on behalf of the prosecution. Subject matter: improper training and whether a drug detector dog was reliable and whether the

dog was cued. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper execution of search warrant, negligent investigation. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: excessive force; *Becker v. Bateman*, Case No. 2:07-CV-311 PGC, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: excessive force. *Salva v. Kansas City Board of Police Commissioners*, Case No. 07-CV00194-JTM, United States District Court of Missouri, Western Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Turnbow v. Ogden City et al.*, Case No. 1:07-CV-114, United States District Court of Utah, Central Divisio , 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Nielson v. South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct; *Trammell v. Jacksonville Beach City Police Department*, Case No. 3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs. Subject matter: excessive force; *Harman & Overton v. Utah Department of Public Safety*, Case No. 2:03CV00558TC, United States District Court of Utah, Central Division, 2007. Deposition testimony given on behalf of the defendants. Subject matter: wrongful execution of a search warrant, negligent investigation; *Herring v. City of Colorado Springs*, Civil No. 04-CV-024229-PAC-BNB, United States District Court of Colorado, 2005. This list is accurate for dates between December 31, 2005, and May 1, 2010. Deposition and/or trial testimony in additional cases are presently scheduled for 2010.

*Consultation and Expert Witness fees, effective January 1, 2010 through December 31, 2010*

I charge$200.00 per hour for document review, witness and officer interviews, report preparation, testimony preparation, and consultation. I charge$250.00 per hour for administrative tribunal, deposition or court testimony. I bill for actual travel expenses and a travel fee of $1,000.00 per day for travel to western states and $1,500.00 per day outside the intermountain west. Payment for travel and travel expenses must be paid in advance of booking. I do not charge for initial consultation and preliminary review of the primary police reports.

# EXHIBIT L

# OFFICER'S HANDBOOK SERIES

# K9 OFFICER'S LEGAL HANDBOOK



# Ken Wallentine

exceeds the statutory minimum wage. The Department of Labor approves this practice in canine cases. *Treece v. City of Little Rock*, 923 F. Supp. 1122, 1128 (E.D. Ark. 1996). U.S. Dep't of Labor Wage & Hour Div. Opinion Letter No. FLSA2006-10.

One practice to avoid is classifying the canine handler as an "independent contractor." The Act does not extend to payments to independent contractors, but it also does not precisely define "independent contractor." Moreover, traditional definitions of independent contractors cannot apply to FLSA cases, because the Act defines the term "employ" very broadly. A person who may be an independent contractor in a worker compensation or tax case is not necessarily an independent contractor for FLSA purposes. Therefore, in order for a police employer to claim that a handler is an independent contractor, it would have to surrender much of its control and authority over the handler's performance of police duties. Obviously, this result is not acceptable.

In the matter of *Thomas v. City of Hudson*, the Hudson (New York) Police Department attempted to define its canine handlers as independent contractors once the handlers sued for pay for off-duty canine care and transportation time. The court found that the department exercised control over the handlers' assignments, the handlers were not in a business with risks and profit opportunities, and that the handlers' duties as police officers were highly integrated to their duties as canine handlers. Thus, the handlers could not be independent contractors under the FLSA. *Thomas v. City of Hudson*, 3 Wage & Hour Cases 2d (BNA) 513 (1996).

The *Hudson* decision shows the folly of a department trying to construct a legal contractor relationship after the fact. However, a department could consider contracting with officers for home care duties, recognizing that the officers were "employees" at all other duty times. Some departments have avoided the home care issue entirely by leasing police service dogs from their handler/owners and assigning the responsibility for care and grooming to the handler while assuming financial responsibility for risk of loss and veterinary care.

Another generally impractical method of resolving home care issues is the central kennel. In a central kennel system, officers report to a department-operated kennel each shift to pick up their assigned canine. The officer is not even required to take the canine home. This approach may initially seem attractive, but it is economically viable only in very large canine units. Even then, there are numerous disadvantages to central kennels. Officers will still have some distance to travel from and to the kennel at the beginning and end of their shifts. Also, the dogs are less likely to maintain a high degree of discipline and control because they are not under the relatively constant supervision of their handlers. At the

# EXHIBIT M

General Order 07-004
Police Canine Policy
Rev  09/25/07

I.   **Purpose**
     The Manalapan Township Police Department recognizes that the use of a police
     canine unit is a cost efficient, effective and viable way to deal with many criminal
     situations.  This department's K-9 program shall follow the K-9 Training
     standards and qualification requirements as outlined under the New Jersey
     Attorney General Guidelines.

II.  Policy
     It is the policy of the Manalapan Township Police Department to provide a canine
     unit for the department as a resource and tool for achieving the law enforcement
     goals of the organization.

III. General Administration
     A.   Primary missions of the canine unit include, but are not limited to the
          following;
          1.   To provide trained canine teams to assist in the prevention and
               detection of crime
          2.   To provide for the tracking of persons sought by the Police
          3.   To provide for the protection of police officers
          4.   Any other such duties as may be directed by competent authority.
     B.   The personnel assigned to the canine unit shall perform regular duties of
          the police department except when their services are required for special
          details and/or training purposes.
     C.   The officers assigned to the canine unit shall be selected by the Chief of
          police or his/her designee.
     D.   Police Canine teams shall be equipped with necessary equipment to
          include, but not limited to the following;
          1.   Class B Uniform
          2.   Dedicated Vehicle for the Canine team
          3.   Police canine harnesses
          4.   Assorted leads
     E.   Personnel Assigned to the canine unit are responsible for complying with
          all department rules and regulations, policies and procedures.  In addition
          they shall be responsible for the following;
          1.   The proper handling and care of their assigned  police canine.  A
               trained police dog used carelessly or improperly is dangerous and
               could lead to criminal and civil liability and discredit to the entire
               police department.
          2.   The proper handling of the police canine during off duty hours to
               prevent dog bites to innocent persons and to prevent the canine
               from being unattended to prevent accidental injury.
          3.   The responsibility to provide for the general health, hygiene and
               care of their assigned canine to include periodic veterinarian
               examinations.  All injuries or sickness to their assigned canine shall
               be promptly reported and treated.

Chief_____
Date_____                              2

P.003          732 612 6744          WAKEFERN DAIRY/DELI          08:24  AUG-28-2009

General Order 07-004
Police Canine Policy
Rev. 09/25/07

    4. To ensure that their assigned canine is not used in any freshly painted building where paint fumes are still lingering

    5. The proper care and maintenance of their assigned canine vehicle.

    6. Immediate notification to the Patrol Division Commander of any type of problem or difficulty with the canine so that appropriate action can be initiated.

    7. To ensure that he/she have attended the required amount of annual in-service training as well as any other training required by competent authority.

    8. The performance on any other police duty as may be required by competent authority.

F. Canine handlers are reminded that the dogs of the canine unit are the property of the Township of Manalapan

G. Carelessness and/or showing off of police canines at any time or place is strictly prohibited.

H. The feeding or petting of dogs by the public is to be politely discouraged. The teasing of any police canine shall not be tolerated.

I. Discretion is to be used by all canine handlers to prevent dogs from defecating in or near public and/or private buildings either on or off duty.

J. Canines shall not be allowed to drink form any public drinking fountain, pools or stagnant puddles, nor shall they be permitted to wade or swim in any pool unless in the performance of their duties.

K. Periodic visits may be made to the homes of handlers by the Chief of Police or his/her designee to ensure for the health, sanitation and security of the police canine.

L. Canine handlers shall be assigned to a patrol squad and shall be counted for manpower purposes.

M. Prisoners shall not be transported in a canine vehicle except in emergency circumstances.

N. At no time are canines to be utilized in the police facility except

    1. with direct orders from a Watch Commander, Captain or higher ranking authority or

    2. for the specific purposes of conducting a narcotic detection search where property suspected in drug activity is hidden for the canine to detect narcotic scent

IV. Request for Canine Unit services

A. Requests from within Manalapan Township

    3. Any request for a canine unit within the township shall be made by the Watch Commander, patrol sergeant or officer in charge

    4. When a supervisor is present the Canine officer shall be responsible for providing the supervisor with sufficient information regarding the proper use of the dog so that the supervisor may then assume the responsibility for determining whether and to what extent a canine team shall be deployed.

Chief _____

Date 9-25-07

3

TOTAL P.012

General Order 07-004
Police Canine Policy
Rev. 09/25/07

        3.    Complete documentation and explanation of the circumstance involving any physical apprehension.

    B.    The K-9 activity report shall be forwarded with other paperwork consistent with department policy. A copy of the report shall be forwarded to the Patrol Division Commander.

XXII.  Compensation for K-9 Duties

Any officer assigned to the K-9 shall be compensated for his or her duties as a K9 officer by being compensated for one additional hour as follows

| Shift | Shift hours | K-9 time |
|---|---|---|
| Midnight Shift, Regular | 2145-0730 | 2145-2245 |
| Midnight Shift, Short | 2300-0730 | 0630-0730 |
| Day Shift, Regular | 0700-1700 | 1600-1700 |
| Day Shift, Short | 0700-1630 | 1530-1630 |
| Swing Shift, Regular | 1400-2400 | 1400-1500 |
| Swing Shift, Short | 1530-2400 | 2300-2400 |

XXIII. **Disclaimer**

This policy is developed by the Manalapan Township Police Department for internal use only, and does not enlarge an officer's civil or criminal liability in any way. This policy should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third party claims. Violations of this policy can only be the basis of a complaint by this department, and then only in an administrative disciplinary setting.

Chief _____
Date _____

11

KM 000011

# EXHIBIT N

To be eligible for participation in K-9 officer training, the trainee must be a certified law enforcement officer, employed by a law enforcement agency. Approval to participate in training must be granted by the agency executive or designee.

### K-9 Patrol Teams

Patrol dog teams must demonstrate to the satisfaction of a K-9 trainer or supervising K-9 trainer successful completion of all performance objectives included herein. Successful completion of the basic program must be accomplished prior to deployment of a patrol dog team for law enforcement purposes.

The areas of training to be covered in the basic program for police K-9 patrol teams are listed hereafter. Performance objectives have been developed for each of these areas of training and are outlined in Appendix B.

Basic training for K-9 patrol team officer handlers must cover:

- The Role and Use of the Police Patrol Dog
- Techniques and Field Procedures
- Policy, Procedures, and Legal Issues
- Report Writing
- Record Keeping
- The Care and Handling of the Police Patrol Dog

Basic training for police officer handler-police dog patrol teams must cover:

- Obedience
- Agility
- Scent Work
- Criminal Apprehension
- Handler Protection

### K-9 Specialty Teams

Specialty dog teams must demonstrate to the satisfaction of a K-9 trainer or supervising K-9 trainer successful completion of all performance objectives included herein. Successful completion of the basic program must be accomplished prior to deployment of a specialty dog team for law enforcement purposes.

The basic training for K-9 specialty team officer handlers must cover:

- The Role and Use of the Police Specialty Dog
- Techniques and Field Procedures

- Policy, Procedures, and Legal Issues
- Report Writing
- Record Keeping
- The Care and Handling of the Police Specialty Dog

K-9 specialty team training must cover:

- Obedience
- Agility
- Scent Work

Performance objectives developed specifically for K-9 specialty teams used in law enforcement are outlined in Appendix C. The evaluation inventory is based on the performance objectives developed for K-9 specialty teams.

## IN-SERVICE TRAINING AND RE-EVALUATION

In-service training is necessary for K-9 patrol teams and K-9 specialty teams to maintain proficiency in basic skills and to ensure continued effective performance. After initially qualifying as a K-9 patrol team or K-9 specialty team, the police officer handler and police dog team must at a minimum be re-evaluated semi-annually. During this re-evaluation, K-9 patrol teams and K-9 specialty teams must demonstrate, to the satisfaction of a K-9 trainer or supervising K-9 trainer, their ability to perform basic skills. K-9 patrol team re-evaluation must cover obedience, agility, scent work, criminal apprehension and handler protection skills. K-9 specialty team re-evaluations must concentrate on obedience, agility, and scent work.

K-9 patrol teams and K-9 specialty teams must complete in-service field training exercises in order to maintain skills which must be performed during re-evaluations. In-service training must be conducted a minimum of 4 times annually in addition to the canine team's re-evaluations. While it would be beneficial to conduct such training monthly, the frequency of such training is at the discretion of the agency executive. As a component of in-service training, classroom instruction must be given at least annually by a certified K-9 trainer or Supervising K-9 trainer to provide police officer handlers with a review and update of policies, applicable statutes and case law, and court rules which are relevant to K-9 operations.

In-service training and re-evaluation records should include information concerning the content of the training or re-evaluation program, who participated in the training or re-evaluation, when and where the training or re-evaluation took place, and who instructed the training or conducted the K-9 team re-evaluation.

- The dates, type and location of training and qualification activities.

- A description of all training objectives covered or qualification exercises conducted.

- An evaluation based on the performance objectives set forth herein for the police officer handler-police dog team which indicates whether training was satisfactorily completed.

- A summary of any problems observed and any corrective measures taken and the outcome of those measures.

- A course schedule and detailed lesson plan.

### In-Service Training and Re-Evaluation Records

In general, in-service records must minimally include the same information as that provided in basic training records.  The in-service performance evaluation for police K-9 teams must cover those performance objectives or indicators which are relevant to in-service training.

## TRAINING SITE OR FACILITY REQUIREMENTS

K-9 training sites or facilities must be under the direct supervision of a K-9 trainer or supervising K-9 trainer, and approved for training purposes by the law enforcement agency executive employing or retaining the K-9 trainer or supervising K-9 trainer.  The training site or facility must provide the environment necessary to conduct all aspects of the training set forth herein, including appropriate simulation exercises.  The area used must be adequate to accommodate an agility course as well as various types of searches.  Suitable off-site buildings and other structures for use in conducting searches and scent work exercises must be available as well as areas appropriate for tracking exercises. Areas for tracking must include a diversity of terrains or geographical conditions.  Secure areas should be used, as appropriate, to conduct training and simulation exercises.

## FAMILIARIZATION TRAINING FOR SUPERVISORS AND OTHER OFFICERS

Familiarization training should be conducted for those superior officers who are responsible for supervising or overseeing K-9 teams and operations as well as for other officers and recruits within the agency.  This training should minimally consist of familiarization with the capabilities of agency K-9 patrol teams and K-9 specialty teams,

procedures to be followed in conjunction with the utilization of K-9 teams, and proper conduct around K-9 teams. The course should be conducted by a K-9 trainer, supervising K-9 trainer, or police officer handler.

Familiarization training is appropriate not only for recruits, veteran officers and supervising officers who are employed by an agency which operates a K-9 unit, but also for recruits, veteran officers and supervising officers whose employing agencies do not operate K-9 units, should the agency call for K-9 assistance from a neighboring community.

## **POLICY AND PROCEDURES**

The law enforcement agency executive is responsible for establishing standard operating procedures to incorporate the provisions of this policy as well as the unique requirements of the agency. The existence of clearly written policy and procedures will provide standards for the appropriate use of K-9 teams and provide practical guidance for effective K-9 operations. General areas to be covered by such policy and procedures include:

- The circumstances or conditions under which K-9 teams may and may not be utilized.

- The deployment and use of K-9 teams and services within and outside the local jurisdiction under various circumstances.

- The role and responsibilities of the police officer handler, supervisory personnel and other officers in conjunction with K-9 teams and the use of K-9 teams.

- Reporting requirements and record keeping.

- The training, qualification and re-evaluation of K-9 teams, including trainee selection, instructor qualifications and training site selection.

- The care, handling and maintenance of police dogs.

7/2002

KM 000025

1.3.1   The police officer handler will list sanctions a law enforcement officer may face as a result of the improper use of a police dog, including departmental liability, criminal liability, and civil liability.

1.3.2   The police officer handler will demonstrate knowledge of when it is proper to use a police dog, including identifying the conditions that must be met before using a police dog to conduct searches and criminal apprehensions.

1.3.3   The police officer handler will demonstrate knowledge of the proper use of the police patrol dog as a force option.

1.3.4   The police officer handler will identify the significance and purpose of K-9 policy and procedure.

1.3.5   The police officer handler will identify the general types of information to be included in a departmental K-9 policy, including:

- the circumstances or conditions under which K-9 teams may and may not be utilized;

- the deployment and use of K-9 teams and services;

- the role and responsibilities of the police officer handler, supervisory personnel and other officers;

- reporting requirements and record keeping;

- the training, qualification and re-evaluation of K-9 teams; and

- the care, handling and maintenance of police dogs.

1.3.6   The police officer handler will demonstrate familiarity with agency policy and procedures pertaining to the use of police dogs.

## 1.4  REPORT WRITING

Goal:  The police officer handler trainee will have the knowledge to properly complete a police report for any given situation requiring the use of a police dog.

1.4.1   The police officer handler will list the qualities of a good police report for situations which required the use of a police dog.

1.4.2   The police officer handler will list the types of information to be included in an incident report, offense report or use of force report dealing with the use of a police dog.

1.4.3   The police officer handler will be familiar with individual agency requirements for reports and records pertaining to operations or activities involving police dogs.

## 1.5  RECORD KEEPING

Goal:  The police officer handler will be familiar with all record keeping requirements and informational needs concerning K-9 operations.

1.5.1   The police officer handler will identify the types of records that must be kept regarding the use of police dogs, including training records, incident reports and health reports.

1.5.2   The police officer handler will identify the information items to be included in records or reports which pertain to K-9 operations or activities.

## 1.6  THE CARE AND HANDLING OF THE POLICE DOG

Goal:  The police officer handler will have the knowledge necessary to properly care and handle the police patrol dog under routine conditions and emergency care situations.

1.6.1   The police officer handler will demonstrate knowledge of the methods and procedures for selecting, evaluating and preparing police patrol dogs for training.

1.6.2   The police officer handler will demonstrate familiarity with K-9 equipment and the proper use of that equipment.

1.6.3   The police officer handler will list the requirements of proper routine care of a police dog, to include daily health check inspections, routine health care and veterinarian visits, feeding, grooming, and housing.

1.6.4   The police officer handler will identify the proper techniques, procedures and equipment to be used in emergency care situations, including heat stroke, bloating, trauma, poisoning.

KM 000030